UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO: 08-28 |
| CLIFFORD E. CLAYTON | SECTION: "J" |

## ORDER AND REASONS

Before the Court is Defendant Clifford Clayton's **Opposition to Government's Motion to Execute Garnishment against Defendant's Assets in Contravention of Court's Judgment (Rec. Doc. 49)**, which challenges the Government's request for a writ of garnishment against the New Orleans Baton Rouge Steamship Pilots Association ("NOBRA") as to various amounts owed or prospectively payable to Clayton in satisfaction of the $533,727 balance of criminal restitution owed by Clayton under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663 *et seq*.

## PROCEDURAL HISTORY AND BACKGROUND FACTS

Clayton pled guilty to three misdemeanor counts for failure to file tax returns for the years 1999, 2000, and 2001. Subsequently, Clayton was sentenced to 18 months in prison, and was also ordered to pay a total of $608,727 in restitution to the Internal Revenue Service ("IRS"). The Court's Judgment and

Commitment Order ("J&C") specifically provided as follows:

> The payment of the restitution of $608,727.00, shall
> begin with a lump sum payment of $75,000.00, to be paid
> by APRIL 3, 2009, and to continue while defendant is
> incarcerated. Any unpaid balance upon release from
> incarceration shall be paid at a rate of $5,000.00 per
> month. The payment is subject to increase or decrease,
> depending on the defendant's ability to pay.

Rec. Doc. 29 at p.4. The J&C also mandates that Clayton "shall

pay any restitution . . . that remains unpaid at the commencement

of the term of supervised." Id. at p. 3.

In accordance with the order of restitution, the Government

moved for and was granted a writ of garnishment to NOBRA, among

others, as Clayton's employer[1] at the time of his conviction.

---

[1] According to Clayton, NOBRA is simply an administrative
and financial clearing house for river pilots, who actually work
as independent contractors and merely channel by mutual agreement
all of their individual bills (issued in their own names) through
NOBRA. NOBRA, in turn, forwards the individual bills to ships'
agents for payments, which are sent directly to NOBRA. NOBRA
then deducts its expenses and divides the rest among the pilots
according to an agreed daily rate multiplied by the days a pilot
is on the work schedule. As a result of this system, NOBRA does
not actually generate income, make investments, or pay taxes; it
merely distributes all money received from active pilots' billing
to all pilots – active and inactive – in the year the money is
received after deducting expenses such as sick leave, vacation,
and retirement income from the active pilots' gross income.
Each pilot is entitled by agreement to 15 sick days and two
weeks vacation per year. Additionally, a pilot who has worked at
least 25 years may elect to become inactive and receive half pay.
This elective half pay system constitutes the pilots' retirement
benefits. Each active pilot works roughly the same number of
days per year and receives a 1099 form at the end of the year,
showing the value of shares disbursed to him during the year
minus the NOBRA deductions (i.e. NOBRA overhead and deferred

NOBRA's initial garnishment answer indicated several amounts owed
to Clayton, but did not distinguish whether those amounts were
wages/earnings or retirement benefits.  Accordingly, the
Government requested that NOBRA amend its answer to specify the
nature of the various amounts due.  NOBRA's amended response
indicated the following amounts due to Clayton: (1) $30,000 in
lump-sum earnings while Clayton's retirement request was
processed; (2) $685 monthly from June 2009 – July 2010 as a pro
rata share of initiation fees of other pilots; (3)
$30,000-$31,500 monthly from June 2009 – December 2009 for
accrued, unused sick leave; and (4) $15,000 – $16,000 monthly
from January 2010 for life for "retirement benefits paid from
revenues generated by active pilots based on a daily rate."  The
Government instructed NOBRA to release to Clayton 75% of the
first two categories pursuant to the garnishment limitations on
"earnings" under the MVRA, Federal Debt Collection Procedures Act

_____

income payments to sick, vacationing, or retired pilots).  An
active pilot's 1099 form does not include the amounts deducted by
NOBRA; however, the form does show payments made to a pilot for
sick or vacation leave, and also shows payments made during
retirement.
    As a final note, active pilots can, by mutual agreement,
"stand each others watch" – that is, take over another pilot's
schedule in return for an agreed-upon split of the substituted
pilot's income.  Clayton notes that during the year prior to his
sentencing, he had not stood his watches due to his treatment for
serious medical conditions.  As such, Clayton only received
$180,000 of his usual $360,000 yearly salary.

("FDCPA") and Consumer Credit Protection Act ("CCPA").  Likewise,
the Government requested a release of 75% of the third category
to Clayton.[2]  Finally, the Government requested 100% of the
fourth category - present or anticipated retirement benefits.

Currently, after the $75,000 payment ordered by the Court at
Clayton's sentencing, $533,727 remains owed under the Court's
restitution order.  Clayton self-surrendered to the Bureau of
Prisons on May 5, 2009 as ordered in the J&C.

## THE PARTIES' ARGUMENTS

Clayton argues that this Court's J&C - not the statutory
provisions relied on by the Government - control the course of
Clayton's restitution obligations.  In other words, because the
Court's J&C allows for $5,000 monthly payments - and not an
immediate payment of the entire restitution amount at once -
Clayton argues that the Government's attempts to garnish his
retirement benefits when he has not yet defaulted on any of his
monthly payments - and after he has paid the initial $75,000 lump

---

[2]  The Government notes that, although it initially intended
to garnish the full 100% of Clayton's accrued sick leave
benefits, further research revealed that only 25% could be
garnished, and thus acquiesced to the 75% release to Clayton.
Thus, while Clayton's memorandum indicates that NOBRA continues
to withhold $12,000 in sick leave and retirement income payments
per the Government's instruction, this is apparently no longer
the case as indicated by the Government's response.  As such, it
appears that only Clayton's retirement benefits remain at issue.

4

sum ordered by the Court - is improper.  Clayton cites the
admittedly non-binding decision of the Northern District of Texas
in United States v. Roush, 452 F. Supp. 2d 676 (N.D. Tex. 2006).
The defendant in Roush pled guilty to tax evasion and was ordered
to pay restitution to the IRS as part of his sentence under a
court-ordered payment schedule.  Id. at 677-78.  However, the
Government sought to garnish the defendant's wife's bank
accounts, arguing that it was not bound by the Court's payment
schedule as issued in the criminal judgment, and further
asserting that the restitution order was a judgment on which the
Government could execute in full by means of garnishment at any
time.  Id. at 680.  The Roush court summarized its holding after
analyzing the various statutory provisions - most importantly 18
U.S.C. § 3664[3]- and the language of its criminal judgment and
restitution order:

> The government claims that at any time it can collect the
> full amount of restitution, without needing court
> approval; because that ability would be inconsistent with
> the judicial control over timing of restitution set forth
> in the statute, as well as the language in the judgment
> providing for a payment schedule, the Court grants
> [defendant's] motion to quash.

Id. at 677; see also United States v. Christ, 2007 WL 32522612
(N.D. Ill. 2007) (citing Roush in holding that the Government
could not execute on full amount of criminal fine in light of

---

[3]  This section lays out the framework by which the Court
determines the amount and terms of a criminal restitution order.

district court's order establishing a payment schedule).
Additionally, Clayton cites the Fifth Circuit's decision in
United States v. Ekong, 518 F.3d 285 (2007) for the proposition
that a district court's criminal judgment is controlling
vis-a-vis the Government's right to seek garnishment in
satisfaction of the entire restitution amount.  Specifically,
Clayton argues that in affirming the grant of the Government's
garnishment writs as to immediately distributable employer
matching funds, the Fifth Circuit specifically noted that nothing
in the language of the district court's criminal judgment
precluded the requested garnishment.  Id. at 286.  As noted in
the Government's briefing in Ekong, the district court's criminal
judgment indicated that the defendant would have to pay at least
$500 per month toward the restitution amount after his release
from prison, and as such, the Government was not precluded from
seeking more than that $500 amount via garnishment.

     In light of these cases, Clayton argues that, because the
Court's J&C ordered a specific monthly payment of $5,000, and
because he is not in arrears on those payments, the Government
cannot require him to pay more than that monthly amount by
garnishing his retirement benefits and accrued sick leave pay.

     As an additional note, Clayton points out that due to his
conviction, he was brought before the Board of Examiners, which
after a disciplinary hearing informed him that it would recommend

to the Governor that his commission be revoked.  Clayton contends

that this move was "political" (as he argued at his sentencing)

and had never previously been leveled against any pilot for mere

misdemeanor convictions.  In any event, Clayton notes that if his

commission had been revoked, he would have been left without

income or health insurance, because without an active commission

he could not have a fellow pilot stand his watches.  As such, and

because he could not afford to appeal the board's decision,

Clayton was essentially forced to resign his commission and take

inactive status, which would allow him to receive half his usual

income and retain medical insurance.  Once this request for

inactive status is processed, Clayton will receive the income

identified in item (4) of NOBRA's garnishment answer.

Accordingly, the half-pay received as a result of his taking

inactive status should be categorized as deferred income, as

these amounts are intended to compensate him for monies earned by

him while on active duty but paid to fellow pilots under the

NOBRA "retirement/sick leave/vacation time" system.

     As such, and in the alternative to his argument that the

government is precluded from garnishing his NOBRA "retirement"

benefits in light of the J&C, Clayton argues that his inactive

"retirement" income is exempt from garnishment under 26 U.S.C. §

6334(a)(9), which exempts from levy "any amount payable to or

received by an individual as wages or salary for personal

services . . . during any period, to the extent that the total of
such amounts payable to or received by him during such period
does not exceed the applicable exempt amount determined under
subsection (d)."  Clayton argues that because his "retirement"
benefits are not from an employer's fund like a normal pension,
and are instead simply deferred wages he earned while on active
duty, those payments should be exempt from garnishment.

In response, the Government argues that the payment
provisions of the J&C do not preclude the Government from seeking
full and immediate payment of the restitution order by the
aggressive means of garnishment.  First, the Government asserts
that Clayton misinterprets the J&C in his argument that the
$75,000 lump sum payment and $5,000 post-incarceration monthly
payment constitute a maximum possible payment under his
restitution obligation.  Rather, although the J&C does not
specifically state that the entire amount is due immediately, the
Government argues that the language of the J&C indicates that the
full amount is immediately collectable.  For example, the
Government notes that the restitution repayment was to begin with
the initial $75,000 lump sum payment "and continue while
[Clayton] is incarcerated."  Rec. Doc. 29 at p.4.  The Government
argues that if the lump sum payment was intended to obviate any
payments during the 18 month term of Clayton's imprisonment, then
the quoted language would be superfluous.  Additionally, the

Government notes that the J&C further indicates that "any unpaid
balance upon release from incarceration shall be paid at a rate
of $5,000.00 per month." Id. (emphasis added). The Government
contends that the use of the word "any" in the J&C suggests that
the Court contemplated the possibility that Clayton might pay the
full restitution amount while in prison, or that the full amount
might be collected by other means. Finally, the Government
points out that the terms of Clayton's supervised release
indicate that he will pay any restitution "that remains unpaid"
at the commencement of his release. Again, the Government argues
that if the J&C payment schedule precluded accelerated collection
efforts, there would be no need for the uncertain language in the
supervised release terms regarding possibly unpaid amounts.

Further, even if Clayton's limiting interpretation of the
J&C were correct, and the Court did intend to impose a strict
$5,000 per month payment schedule, the Government contends that
the Fifth Circuit's decision in Ekong - a case that Clayton
acknowledges - actually precludes Clayton's argument. The
Government notes that the district court's restitution order in
Ekong included language similar to the J&C in this case:

> If upon commencement of the term of supervised release,
> any part of the restitution remains unpaid, the defendant
> shall make payments on such unpaid balance beginning 60
> days after release from custody at the rate of at least
> $500.00 per month until is [sic] paid in full.

Rec. Doc. 50 at p.6 & Rec. Doc. 50-1, p. 6. The Fifth Circuit

9

rejected the defendant's argument that this language precluded the Government from garnishing her retirement benefits while she was incarcerated. <u>Ekong</u>, 518 F.3d at 286. The court went on to point out that a restitution order under the MVRA can be enforced in the same manner as a civil judgment, and further noted that the Attorney General is required under the MVRA to enforce restitution orders "aggressively." <u>Id</u>. As such, the <u>Ekong</u> court held that nothing in the payment schedule in the district court's criminal judgment precluded the Government's collection efforts. <u>Id</u>. The Government argues that <u>Ekong</u> defeats Clayton's arguments directly, and further notes that the language in the J&C is even more encouraging of accelerated collection in light of the fact that it requires payments even during Clayton's incarceration and contemplates that there might not even be an unpaid balance at the commencement of Clayton's supervised release period.

The Government acknowledge's the contrary precedent in the Northern District of Texas's decision in <u>Roush</u>, but notes that it pre-dates <u>Ekong</u>. The Government also notes that while the <u>Roush</u> court distinguished its holding from other cases in which the restitution order specifically indicated that the restitution amount was "due and payable immediately," <u>Ekong</u> reached a contrary result based on language in a criminal judgment that itself did not indicate whether or not the restitution amount was immediately due. As such, the Government argues that <u>Ekong</u> found

the lack of an "immediately due" provision - which was the

foundation of the holding in Roush - to be unimportant.  As such,

since the language in the J&C in this case and the language at

issue in Ekong are similar, and since Ekong post-dates Roush, the

Government contends that Ekong should govern this case.

Alternatively, the Government suggests that the Court can simply

amend the J&C to include an "immediately due" provision if the

Court finds such language to be a necessity.

    The Government notes that other courts have reached a

similar conclusion as Ekong.  For example, the Western District

of Michigan in United States v. Miller imposed a term of

imprisonment along with an order of restitution to be paid in an

initial lump sum and subsequent quarterly installments during the

term of imprisonment.  2008 WL 4838233 (W.D. Mich. Nov. 6, 2008).

The defendant in Miller objected to the Government's garnishment

of his pension account during his incarceration, citing his

compliance with the court's repayment scheduled.  Id. at *1-2.

The Miller court rejected this argument, citing Ekong as support.

Id. at *7.  See also, e.g., United States v. Hawkins, 392 F.

Supp. 2d 757, 760 (W.D. Va. 2005) (approving garnishment under

restitution order despite defendant's currentness on monthly

installments); United States v. Kuehler, 2006 WL 2981831 (D.

Idaho Oct. 16, 2006) (noting that any court-established payment

schedule cannot preclude the Government from levying on a

defendant's property in satisfaction of a restitution order).

In addition to this jurisprudential support for its position, the Government also presents a statutory argument in support of the present garnishments. First, the Government points out that the MVRA not only allows for restitution orders to be collected in the same way as a normal civil judgment, but also allows for victims to receive and record an abstract of the judgment as a lien against property owned by the defendant. 18 U.S.C. § 3664(m)(1)(B). The Government notes that some courts have observed that preventing the United States from enforcing a restitution order in the face of a court-ordered payment plan would not make any sense in light of this lien-creating provision, which otherwise allows a victim to execute against all property of the defendant. Hawkins, 392 F. Supp. 2d at 759. Furthermore, in addition to emphasizing the Attorney General's obligation to "aggressively" collect restitution, the MVRA allows for such enforcement "by all . . . available and reasonable means," including writs of garnishment under the FDCPA. 18 U.S.C. § 3664(m)(1)(A)(ii). Accordingly, if Congress had intended for the Government to be bound by court-ordered payment schedules, these enforcement methods provided in the MVRA would be superfluous. United States v. Lawrence, 538 F. Supp. 2d 1188, 1193 (D.S.D. 2008). Next, the Government notes that payment schedules under the MVRA must take into account a defendant's

assets, future earnings, and financial obligations, and thus may result in only minimal periodic payments. See 18 U.S.C. § 3664(f). However, liability for any such payments expires after a term of imprisonment plus twenty years. Id. at § 3613(b), (c). Thus, if the payment schedule were the only mechanism ensuring payment, it might result in only a fraction of the restitution being repaid. United States v. James, 312 F. Supp. 2d 802, 807 (E.D. Va. 2004). This result would conflict with the purposes of the MVRA, and thus the Government argues that any court-imposed payment schedule cannot hamstring its right to execute on a defendant's property.

The Government additionally points out that, because Clayton is incarcerated, the provisions of § 3664(n) of the MVRA apply. This section provides that "[i]f a person obligated to provide restitution . . . receives substantial resources from any source . . . during a period of incarceration, such person shall be required to apply the value of such resources to any restitution . . . still owed." 18 U.S.C. § 3664(n). The Government argues that if a court-imposed payment schedule were the only binding obligation for an imprisoned MVRA debtor, the debtor would be free to retain numerous sources of income (inheritances, dividends, etc.) free from seizure.

Finally, the Government notes that its position does not render court-imposed payment schedules irrelevant. Rather, the

13

court-ordered schedule operates as an in personam judgment against the defendant - such that failure to comply may result in default, revocation of supervised release, or contempt - while the Government's enforcement options operate as in rem rights against the defendant's property.

As for Clayton's alternative argument, the Government notes that the § 6334(a)(9) exemption relied on by Clayton is specifically excluded from the list of exemptions from garnishment provided in 18 U.S.C. § 3613. Thus, since § 6334(a)(9) is specifically omitted from the list of incorporated tax-code exemptions to seizure of property for payment of criminal restitution, the Government argues that Clayton may not rely upon § 6334(a)(9) to contest the present garnishment.

Additionally, the Government points out that to the extent Clayton argues his "retirement" benefits are exempt because they are more in the nature of wages/earnings, he seems to invoke the MVRA's incorporation of the CCPA. The CCPA provides that "the maximum part of the aggregate disposable earnings of an individual for any workweek which is subjected to garnishment may not exceed 25 per centum of his disposable earnings for that week." 15 U.S.C. § 1673(a)(1). Thus, if Clayton is correct that his "retirement" benefits are more akin to "earnings," then they would only be subject to a 25% garnishment. The CCPA defines earnings as "compensation paid or payable for personal services,

whether denominated as wages, salary, commission, bonus, or
otherwise, and includes periodic payments pursuant to a pension
or retirement program."  15 U.S.C. § 1672(a).  The Government
notes this Court's decisions in United States v. Decay, 2009 WL
36623 (E.D. La. Jan. 5, 2009) & 2009 WL 666763 (E.D. La. Mar. 12,
2009), which held that pension benefits are not "earnings" under
the CCPA, and thus should be subject to 100% garnishment.
However, the Government acknowledges that Decay is
distinguishable on the ground that the pension benefits in that
case were paid via a previously funded pension account, as
opposed to the direct payment to Clayton in this case of
half-salary without an intermediary retirement account.
Nonetheless, the Government argues that the full 100% of
Clayton's "retirement" benefits should be subject to garnishment.
First, the Government notes that the CCPA definition of earnings
hinges on payments for "personal services" rendered.  As such,
the "retirement" benefits paid to Clayton - which admittedly will
not and in fact cannot arise from any personal services rendered
by Clayton - should not be deemed "earnings" for purposes of the
CCPA.  Additionally, the Government notes that some cases have
focused on the use of the term "workweek" in the CCPA to hold
that any retirement benefits paid other than on a weekly basis
cannot constitute "earnings" under the CCPA definition.  United
States v. Belan, 2008 WL 2444496, *4 n.4 (E.D. Mich. June 13,

15

2008). Likewise, the Government notes that the purpose of the 25% garnishment limit of the CCPA was to limit the frequent unemployment caused by weekly garnishments. As such, because Clayton will necessarily not be working in order to qualify for his "retirement" benefits, this purpose is inapplicable to him, and those benefits should be garnished to their full amount.

Finally, the Government responds to the schedule of monthly income and expenses attached to Clayton's objection, which ostensibly suggests an argument that the garnishment would pose an undue hardship for Clayton. First, the Government contends that this unsworn document is somewhat confusing. Specifically, Clayton lists $10,000 in taxes owed, but this would not constitute a recurring monthly expense. Second, there was no pre-sentence evidence regarding a $1,200 monthly expense for the support of an adult child. Finally, the Government notes that the PSR indicated that Clayton has substantial liquid assets, none of which are included in the schedule. At this point, the Government has offered Clayton's wife an opportunity to submit, under penalty of perjury, a sworn financial disclosure form to support any claim of hardship, but she has not yet done so. If and when she does, the Government would consider revisiting the hardship issue with the Claytons.

In reply, Clayton argues that if the payment schedule in the J&C is not applicable until after Clayton is released, as the

Government contends, then the Court's detailed analysis and imposition of the payment schedule at sentencing would have been meaningless. As such, Clayton argues that the Government is bound by the payment schedule and cannot proceed with the present garnishment. Likewise, Clayton argues that the Government's argument based on the 20 year limitation on restitution orders is a red herring, because at the presently ordered payment rate, Clayton's obligation will be complete in less than 9 years.

As for his alternative argument, Clayton argues that the 25% exemption provided in § 6334(a)(9) applies to both his "retirement" benefits and his accrued sick leave, both of which constituted income that he earned while working, despite the fact that he will receive the income after resigning his commission. Clayton notes the Government's concession that the sick leave pay is covered by the 25% exemption, but contends that there is no difference between the nature of the sick leave payments - which the Government now recognizes are covered by the § 6334(a)(9) exemption - and his "retirement" benefits, which the Government continues to argue are 100% garnishable.

Finally, Clayton contends that Ekong did not overrule Roush. Clayton reiterates that the Ekong decision was based on the fact that "there [was] nothing in the [criminal] judgment to the contrary" of the United States' collection efforts in that case. Ekong, 518 F.3d at 286. As such, Clayton reasserts that this

holding indicates that a criminal judgment controls the Government's collection efforts, because otherwise the Fifth Circuit's reference to the criminal judgment would have been superfluous. Additionally, Clayton distinguishes the various cases cited by the Government, noting that all of those cases involved criminal judgments that specifically indicated that the restitution amounts were due either immediately upon sentencing or in at least minimum amounts. Clayton argues that the J&C in this case imposes neither of those mandates, and thus the payment schedule in the J&C should preclude the present garnishment.

<u>**DISCUSSION**</u>

**A.    The Enforcement Provisions of the MVRA Trump any Payment Schedule Included in the J&C**

The Government is correct in its contention that the various enforcement mechanisms provided in the MVRA remain available even in the face of a payment schedule instituted by the district court in its criminal judgment. First of all, it should be noted that the J&C indicates that "[t]he [scheduled] payment is subject to increase or decrease, depending on the defendant's ability to pay." Rec. Doc. 29, p.4. Thus, to the extent Clayton contends that the payment schedule set forth in the J&C is set in stone and thus precludes the present garnishment, the J&C expressly refutes that argument given the possibility of adjustments to the payment amount.

Likewise, the Fifth Circuit's decision in <u>Ekong</u> governs the instant case, despite Clayton's focus on the court's language regarding the fact that "there [was] nothing in the [criminal] judgment to the contrary." Although this language might command a different result in a case in which the criminal judgment expressly limits the Government's execution options,[4] the J&C in this case does not include any such limitation. While the J&C does set out a payment schedule, that schedule is adjustable. Furthermore, there is no language whatsoever in the J&C that in any way limits or precludes the Government's rights to enforce the restitution order under the MVRA. As such, the Fifth Circuit's analysis in <u>Ekong</u> directly applies to the instant case:

> [Defendant] contends that there was no justification for requiring immediate payment because the criminal judgment specified that restitution be paid in installments. This argument is without merit. "The [MVRA] provides the Government authority to enforce victim restitution orders in the same manner that it recovers fines and by all other available means" and, under 18 U.S.C. § 3613(a), it may collect "restitution 'in accordance with the practices and procedures for the enforcement of a civil judgment under Federal law or State law,' " including the Federal Debt Collection Procedures Act of 1990. <u>United States v. Phillips</u>, 303 F.3d 548, 550-51 (5th Cir.2002). The attorney general is required by the MVRA to enforce victim restitution orders "aggressively." Id. at 551. There is nothing in the criminal judgment to the contrary.

<u>Ekong</u>, 518 F.3d at 286. As such, the Court agrees with the

---

[4] It should be noted that, even if a district court's criminal judgment did attempt to limit the Government's execution options under the MVRA, it is unclear if such a limitation would be binding in the face of the statutory language.

Government that _Ekong_ governs the instant garnishment
proceedings.

Furthermore, Clayton's argument regarding the lack of any
"immediately payable" language in the J&C is unavailing.  First
of all, while neither the J&C nor the sentencing colloquy
expressly indicated that restitution would be due immediately,
the J&C does indicate that "payment of the restitution of
$608,727.00 shall begin with a lump sum payment of $75,000.00 to
be paid by April 3, 2009, and to continue while the defendant is
incarcerated.  Any unpaid balance upon release from incarceration
shall be paid at a rate of $5,000.00 per month."  Rec. Doc. 29,
p.4.  This language clearly indicates that payment will commence
immediately and continue through Clayton's incarceration.  In
fact, the language of the J&C clearly states that the monthly
payment schedule on which Clayton relies for his arguments
against garnishment does not even commence until his release from
prison.  As such, Clayton's arguments based on the payment
schedule are unconvincing in the face of _Ekong_ and the various
statutory arguments set forth by the Government.  Accordingly,
Clayton's objection to the garnishment on these grounds should be
overruled.

Furthermore, even if _Ekong_ were not binding, to the extent
that the _Roush_ decision from the Northern District of Texas
supports Clayton's position, the case is distinguishable.  First,

the criminal judgment in <u>Roush</u> specifically indicated that

"'payment of the total criminal monetary penalties are [sic] due'

per the [court imposed] schedule; [and thus] the Court

construe[d] its judgment as imposing a restitution obligation

that [was] due only as provided by the Schedule of Payments."

<u>Roush</u>, 452 F. Supp. 2d at 681. Alternatively, in this case, the

J&C does not specifically indicate that the payment schedule is

the sole means of collecting the restitution amount.

Additionally, the <u>Roush</u> court noted that its decision was based

in part on the fact that there was no indication as to whether

the funds sought to be garnished by the Government were the same

funds listed in the pre-sentence report ("PSR"). <u>Id</u>. at n.7. As

such, the <u>Roush</u> court stated that allowing garnishment in light

of the confusion regarding the identity of the funds would

frustrate the Court's independent obligations under MVRA §

3664(f)(2), which requires a court to establish a payment

schedule after consideration of the totality of the defendant's

financial state. <u>Id</u>. There is no such confusion at issue in

this case, and thus this basis for the <u>Roush</u> holding is

inapplicable. Finally, the <u>Roush</u> court noted that the AO-245B

form on which the Schedule of Payments was entered specifically

differentiates between amounts due immediately and amounts due as

scheduled. <u>Id</u>. at n.9. Additionally, the form provides a

default provision that "[u]nless the court has expressly ordered

21

otherwise, if [the] judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment." Id. The Roush court noted that the form included in the defendant's criminal judgment expressly ordered that payment was not due during the defendant's imprisonment. Id. Thus, because the J&C in this case does expressly indicate that payment is due during imprisonment, Roush is inapplicable.[5]

**B.    Applicability of the 25% Garnishment Limit**

Clayton argues alternatively that only 25% of his "retirement" benefits can be garnished, as they constitute "earnings" under 26 U.S.C. § 6334(a)(9) of the IRS Code.

The MVRA provides that a judgment of restitution may be enforced under the same statutory provisions that govern the enforcement of criminal fines. 18 U.S.C. § 3664(m)(1)(A)(I). The relevant provisions for enforcement of fines/restitution provide the following exceptions:

> Notwithstanding any other Federal law . . . a judgment imposing a fine [and/or restitution] may be enforced against all property or rights to property of the person fined, except that–
>
> (1) property exempt from levy for taxes pursuant to section 6334(a)(1), (2), (3), (4), (5), (6), (7), (8), (10), and (12) of the Internal Revenue Code of 1986 shall be exempt from enforcement of the judgment under

_____

[5]    The Court further notes that, to the extent the lack of any "immediately payable" language in the J&C may support Clayton's arguments, the Court could simply amend the J&C to include a provision that the restitution amount is immediately payable.

Federal law;

> ***

> (3) the provisions of section 303 of the [CCPA] (15 U.S.C. 1673) shall apply to enforcement of the judgment under Federal law or State law.

18 U.S.C. § 3613 (emphasis added). Section 6334 of the IRS Code lists several specific categories of property that are exempt from tax levy, and as such are exempt from enforcement under the MVRA. 26 U.S.C. §6334. However, conspicuously absent from the list of IRS Code exemptions is § 6334(a)(9) – the very exemption on which Clayton relies to oppose the 100% garnishment of his "retirement" benefits. This section exempts from tax levy

> [a]ny amount payable to or received by an individual as wages or salary for personal services, or as income derived from other sources, during any period, to the extent that the total of such amounts payable to or received by him during such period does not exceed the applicable exempt amount determined under subsection (d).

Id. Thus, to the extent Clayton argues that his "retirement" benefits are exempt from garnishment under the MVRA because they constitute "wages, salary, and other income" under § 6334(a)(9), the plain language of the MVRA's incorporation of § 6334 except for subsection (a)(9) defeats that position. Accordingly, Clayton's "retirement" benefits, to the extent they constitute "wages, salary, and other income" – as Clayton himself argues – are clearly not exempt from full garnishment under the MVRA. As such, Clayton's objections on this ground should be overruled.

Although Clayton did not clearly argue the point, the Court

will also address the possible argument that Clayton's

"retirement" benefits constitute wages or earnings that should be

partially exempt from garnishment under the CCPA as incorporated

by the MVRA.  The CCPA provides in pertinent part that "[e]xcept

as [otherwise provided] . . . the maximum part of the aggregate

disposable earnings of an individual for any workweek which is

subjected to garnishment may not exceed . . . 25 per centum of

his disposable earnings for that week."  15 U.S.C. § 1673.  The

CCPA defines "earnings" as "compensation paid or payable for

personal services, whether denominated as wages, salary,

commission, bonus, or otherwise, and includes periodic payments

pursuant to a pension or retirement program." Id. at § 1672(a).

While the Government argues that Clayton's "retirement" benefits

may not constitute "earnings" for purposes of the CCPA, and thus

should be fully garnishable, a much more simple reason exists to

allow the full garnishment of those benefits.  Specifically, §

1673(b) of the CCPA - which provides exceptions to the exemptions

enumerated in subsection (a), including the "earnings" exception

- specifically indicates that "[t]he restrictions of subsection

(a) of this section do not apply in the case of . . . (C) any

debt due for any State or Federal tax."  15 U.S.C. § 1673(b)(C)

(emphasis added).  As such, even if Clayton's "retirement"

benefits did constitute earnings under the CCPA - which the Court

does not decide - those earnings would still be subject to full

garnishment under § 1673(b)(C), as incorporated by the MVRA.
Accordingly, to the extent Clayton has argued for a 25%
limitation on the garnishment of his "retirement" benefits, the
argument fails in the face of § 1673(b)(C), and his objection
should be overruled.

With respect to the Government's implication of any possible
hardship argument by Clayton, no relevant evidence is before the
Court at this time, and thus the Court will not address the issue
of hardship.  Accordingly,

**IT IS ORDERED** that Clayton's **Opposition to Government's
Motion to Execute Garnishment against Defendant's Assets in
Contravention of Court's Judgment (Rec. Doc. 49)** is hereby
**OVERRULED**.

**IT IS FURTHER ORDERED** that the Government's request for
entry of a final order of garnishment is **GRANTED** under 28 U.S.C.
§ 3205(c)(7).

**IT IS FURTHER ORDERED** that the garnishee, NOBRA, pay to the
United States:

> • 25% of ~$30,000 in Clayton's June earnings (i.e.,
> ~$7,500);
>
> • 25% of ~$685.00 monthly from June 2009 – July 2010 in
> Clayton's share of pilots' initiation fees ( ~$2,400);
>
> • 25% of ~$30,000 monthly from July – December 2009 in
> Clayton's accrued unused sick leave (~$45,000); and
>
> • 100% of ~$15,000 monthly for life in Clayton's
> retirement payments.

Payments should continue until Clayton's restitution obligation is satisfied.  Payments to United States as ordered above shall be made to the Clerk of Court, Eastern District of Louisiana, Financial Unit, Hale Boggs Federal Building, 500 Poydras St., New Orleans, LA 70130 and shall bear the name of Clifford Clayton and the case number included in the caption of this case.

New Orleans, Louisiana this <u>12th</u> day of <u>August</u>, 2009.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE